# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**VIRGINA KARUL,**

        Plaintiff,

       **-vs-**                **Case No. 13-C-900**

**S.C. JOHNSON & SON LONG
TERM DISABILITY PLAN,** and
**METROPOLITAN LIFE
INSURANCE COMPANY,**

        Defendants.

---

# DECISION AND ORDER

---

Plaintiff Virginia Karul ("Karul") alleges that the Defendants, S.C. Johnson & Son Long Term Disability Plan (the "Plan") and Metropolitan Life Insurance Company ("MetLife") (collectively the "Defendants") violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, because they did not give her a full and fair review of her claim and denied disability benefits under the Plan. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in the Eastern District of Wisconsin pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

This matter is before the Court on Karul's summary judgment motion (ECF No. 22) and the Defendants' motions to strike and joint

motion for relief under Rule 52(a)[1] of the Federal Rules of Civil Procedure or, in the alternative for summary judgment pursuant to Rule 56. (ECF Nos. 27, 40, 42.)

## MOTIONS TO STRIKE

The Defendants seek orders striking Karul's additional proposed findings of fact ("PFOF") in opposition to their summary judgment motion, and exhibit one to the declaration of William E. Parsons — the Linked-In profile of Dr. Jennifer Rooke ("Rooke") and the information contained in the exhibit, or alternatively, they wish to be granted leave to file a response to those additional materials.

Motions to strike are disfavored, *see* Civil L.R. 56(b)(9) (E.D. Wis.). With respect to Rooke's Linked-In profile, which states that she has been a MetLife medical consultant from 2011 to the present, such information could be relevant to a possible conflict of interest, *see Holmstrom v. Metro. Life Ins. Co.,* 615 F.3d 758, 767 (7th Cir. 2010) (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 116 (2008), and is properly before the Court.

Furthermore, the parties proposed the abbreviated schedule that did not provide for any reply, and that schedule was adopted by the Court.

---

[1] Karul agrees that Rule 52(a) is an appropriate alternative for determining a claim for disability benefits under ERISA. (Pl. Mem. Opp'n Mot. Rule 52 J./Summ. J. ("Pl. Opp'n Mem.") 1. ) (ECF No. 32.)

(ECF Nos. 19, 20.)  The additional proposed findings of fact are permissible under Civil L.R. 56(b)(2)(B)(ii) (E.D. Wis.)  In addition, the parties have exhaustively discussed the facts and the Court has examined the record in detail.  No further response is needed.  Therefore, the Defendants' motions to strike, or in the alternative for leave to respond are denied.

## RULE 52(a) MOTIONS

Although the action involves review of the record, many of the proposed findings of fact are disputed.  Therefore, the Court sets forth its findings of fact and conclusions of law pursuant to Rule 52(a).  The factual findings are based on the stipulated facts, the Defendants' proposed PFOF, Karul's PFOF, Karul's additional PFOF, and the underlying factual materials.  Undisputed facts have been accepted as true. The Court has resolved factual disputes by reviewing the record.

Given a record spanning over 2,700 pages and the many facts relevant to this action, the Court begins by summarizing them.  S.C. Johnson & Son, Inc. ("SCJ") employed Karul at its Racine, Wisconsin facility, and she was an eligible employee under the Plan.  The Plan provides 24 months of disability benefits for an eligible employee who is unable to work in her usual occupation.  After 24 months, the Plan provides disability benefits coverage for an eligible employee who is unable

to perform any reasonable work activity.

Karul applied for and, as of November 2009, received 24 months of Plan disability benefits due to respiratory and skin problems exacerbated by a March 2009 workplace incident. Based upon a February 2012 medical evaluation of Karul performed at MetLife's request, Dr. Aubrey Swartz, M.D., ("Swartz"), concluded that Karul was able to perform sedentary work. In March 2012 MetLife informed Karul that she did not qualify for further disability benefits under the Plan.

Karul appealed, asserting that she remained disabled due to various conditions including, but not limited to, back, knee and chest pain; sciatica; migraines; visual impairment; nausea; and wheezing. She also relied upon her continuing receipt of social security disability insurance benefits. At MetLife's request, board-certified occupational medicine physician Rooke reviewed Karul's medical records and contacted her medical providers for information. Rooke concluded that Karul was not disabled. Thereafter, the Committee issued a decision finding that Karul was not disabled.

## Findings of Fact

Karul is a participant in the Plan, which is an employee benefit plan subject to ERISA. MetLife is the Claims Administrator contracted by SCJ to administer claims for benefits arising under the Plan. Karul exhausted

her administrative remedies as a condition precedent to filing this action.

*The Plan*

The Plan's purpose is to financially aid Plan Participants in the event of Total Disability. The Plan defines "Total Disability" as follows:

> A Participant will be considered "Totally Disabled" or to have a "Total Disability" at any time that he or she is unable to work as provided below and is under the Regular Care of a Physician:
>
> (a) During the first twenty-four (24) months that a Participant is absent from work due to Injury or Disease, the Participant will be considered unable to work if he or she is unable, solely because of such Injury or Disease, to perform the Material Duties of his or her Own Occupation or any other Reasonable Job offered by the Employer.
>
> (b) After the first twenty-four (24) months that a Participant is absent from work due to Injury or Disease, the Participant will be considered unable to work if he or she is unable, solely because of such Injury of Disease, to work at any Reasonable Occupation.
>
> A Participant will not be considered to be Totally Disabled more than thirty-one (31) days before the Participant has first been seen and treated by a Physician for the injury or illness causing the Total Disability.

(R. at ML_1617.)[2]   The Plan defines "Reasonable Occupation" as "any

---

[2] The record (R.) is located at ECF Nos. 28-1 through 28-18 and 29-1. Page distribution is as follows: ML_0001-0149 (No. 28-1); 0150-0345 (28-2); 0346-0534 (28-3); 0535-0752 (28-4); 0753-0957 (28-5); 0958-1170 (28-6); 1171-1389 (28-7); 1390-1642 (28-8); 1643-1825 (28-9); 1826-1980 (28-10); 1981-256 (28-11); 2057-2146 (28-12); 2147-2228

gainful activity for which an Eligible Employee is fitted by education, training or experience, or for which the Eligible Employee could reasonably become fitted, and which pays the Eligible Employee at least sixty percent (60%) of the Eligible Employee's Monthly Rate of Basic Earnings." (R. at ML_1616.) The Plan Participant's initial claim for long-term disability insurance ("LTD") benefits is determined by the Claims Administrator. (R. at ML_1623-24.)

If the claim is approved, the Plan Participant's monthly LTD benefit will be reduced by the amount of any benefits received under the Social Security Act during the same time period. (R. at ML_1619-20.) The Claim Administrator has the right to require that the Plan Participant apply for all other benefits for which he or she may be eligible, including Social Security Disability Income ("SSDI"), and appeal any initial denial of such benefits. (R. at ML_1624.) If the claim is denied in whole or in part by the Claim Administrator, the Plan Participant may appeal the decision to the Committee. (R. at ML_1613,1625-26.)

The Plan affords the Committee "[t]he discretion and authority to interpret the Plan, its interpretation thereof in good faith [is] to be final and conclusive on all persons claiming benefits under the Plan;" and "[t]he

(28-13); 2229-2321 (28-14); 2322-2411 (28-15); 2412-2499 (28-16); 2500-2582 (28-17); 2583-2610 (28-18); 2611-2762 (29-1).

discretion and authority to decide all questions concerning the Plan, the eligibility of any person to participate in the Plan, and the amount of any benefits to which a Participant may be entitled." (R. at ML_1629.) The Plan also states that the Committee shall "provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by the Committee, which is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." (R. at ML_1626.)

The Plan is self-insured by SCJ and participating Employers. Benefits are funded by contributions made by SCJ and participating Employers and by Eligible Employees. (R. at ML_1630.) At all times material to this case, the Plan has remained in full force and effect.

*Procedural History Related to Karul's First 24 Months of Disability*

Karul is 59; she has a bachelor's degree in biology and a chemistry minor, and she has worked primarily in the chemical research engineering field. At SCJ, Karul's title was Research Scientist Engineer.

Karul filed her claim for LTD benefits under the Plan on October 27, 2009. (R. at ML_1955-56, 1976.) During her initial interview, Karul described a long history of occupational asthma that had worsened over time. (R. at ML_1974.) In 2004, her symptoms increased when SCJ

transferred her to the Air Care Division in Racine. (R. at ML_1975.) In 2005, Karul developed coughing and wheezing and was unable to sniff fragrances. (*Id.*) In 2006, Karul developed increasing itchiness on her arms. (*Id.*) In 2008, Karul was off of work for a time and her symptoms improved; however, when she returned to work her itchiness was worse than before. (R. at ML_1975-76.) By mid-January 2009, Karul developed nausea and vomiting and was getting sick at work. (R. at ML_1976.)

In March 2009, Karul got hot, broke out in a sweat, her face became blotchy and red, and she felt faint. (*Id.*) Karul believed her symptoms were caused by an SCJ product sprayed near her. (*Id.*) The following day Karul was wheezing, coughing and had blurry vision. (*Id.*) She attempted to return to work, but she was advised to avoid chemicals by both SCJ's occupational physician and her allergist, Dr. Jordan Fink ("Fink"). (R. at ML_1976-77.) As of October 2009, Karul was 5'8" and weighed about 223 pounds. (R. at ML_1731.)

In November 2009 Karul informed MetLife that she was on an extended visit to California, where she was raised, and that when she was in California, "she ha[d] no problems." (R. at ML_1977.) Karul stated that "there [wa]sn't anything special about being in California, [it was] just out of the area where she work[ed] in Racine." (*Id.*) Karul stated that Fink

- 8 -

was planning on a laryngoscopy "to help determine what [was] causing her symptoms." (R. at ML_1977-78.) Karul indicated to MetLife that she hoped SCJ would transfer her to a different division in a different state and that she wanted to return to work. (R. at ML_1978; 1985.)

MetLife determined that Karul was unable to perform the duties of her own occupation as of November 25, 2009, and approved her application for LTD benefits following the requisite elimination period under the Plan. (R. at ML_1811.)

As required by the Plan, Karul applied to the Social Security Administration ("SSA") for SSDI benefits in April 2010, identifying her disabling condition as chemical exposure. (R. at ML_0729-50.) The SSA denied Karul's claim. (R. at ML_2726.) After an appeal by Karul, the SSA determined that she became disabled as of May 19, 2010, and awarded her SSDI benefits in the amount of $2,254 per month beginning in November 2010. (R. at ML_0565.)

During 2010 and 2011, MetLife periodically reviewed Karul's eligibility for benefits and determined that she remained totally disabled from her own occupation as defined by the Plan. (R. at ML_1418-19, 1639, 2061-62, 2085, 2167-69.)

After receiving LTD benefits for 24 months, the standard of

disability applicable to Karul's claim changed from the inability to perform her "own occupation" to the inability to perform "any reasonable occupation," meaning any occupation for which she could "reasonably become fitted" and which would pay her at least 60% of her pre-disability earnings.

In November 2011, MetLife notified Karul that pursuant to the terms of the Plan it was reviewing her eligibility for benefits beyond November 25, 2011, under the "any reasonable occupation" standard of disability. (R. at ML_1249.) In March 2012, MetLife explained its determination that Karul was no longer "totally disabled" as defined by the Plan and that her benefits would end effective April 1, 2012. (R. at ML_1097-1100.) In February 2013, Karul appealed the Defendants' adverse benefits determination. (R. at ML_0532.)

*Karul's Claims Related to Chemical Sensitivity*

Karul's medical record reflects treatment for chemical sensitivity as early as March 2009, continuing throughout 2009 (R. at ML_1894-95, 0497-500, 0503-04, 1726) and from April 2010 through January 2011 (R. at ML_0689, 0890, 1695-97, 1709). Karul's symptoms related to chemical sensitivity include chest congestion, cough, asthma, blurred vision, sore throat, wheezing, headaches, shortness of breath, skin rash, fatigue, and

shakiness. (R. at ML_0422, 0543-44, 0594, 0598, 0604, 0689, 0890, 1709.) Karul's doctors during this period were Fink, Dr. Thuthuy Phamle (Phamle), and Dr. Monica Vasudev, M.D. (R. at ML_0688-91, 0890, 1695-97, 1709, 1726.)

On two occasions, in October and December 2009, Karul reported that her symptoms "improved" when she went to California. (R. at ML_1690, 1726.) Additionally, in October 2010, Fink explained to Dr. Jennifer J. Brittig that Karul was "relieved" of her asthma symptoms while in California. (R. at ML_1709.)

Karul's most recent visit to the emergency room due to "chronic lung disease exacerbation" and "chronic sinusitis" occurred in January 2011. (R. at ML_0422.) However, Karul continued to receive consistent treatment with prescription medication — including Triamcinolone, Singulair and Clarinex — for her allergic and chemical induced asthma well after January 2011. (R. at ML_0262, 0309, 0394, 0401, 1462.)

Karul had an office visit with Phamle in February 2011 for treatment related to acute sinusitis and acute bronchitis, and for follow-up regarding a January 2011 emergency room visit due to wheezing and difficulty breathing. (R. at ML_1462-65, 0422.)

In April 2011 allergic reactions to nine chemicals were reported. (R.

at ML_0179.)

Karul visited Phamle in September 2011 for nasal congestion but was found to have clear lungs and non-labored respirations. (R. at ML_0413-416.) Phamle prescribed over the counter medications. (*Id*.) After physically examining Karul, Phamle listed "acute bacterial sinusitis" among her diagnoses. (*Id*.)

In December 2011, Karul saw Dr. Adric Huynh ("Huynh"), a family medicine physician in the same medical group as Phamle, for medication refills and referrals. (R. at ML_0387.) Karul reported chronic fatigue syndrome and chronic pain syndrome, chemically induced respiratory sensitivity, and chronic migraines. Huynh documented Karul's reports of weakness and fatigue and his finding of muscle pain upon examination. Absent were nasal congestion, sore throat, shortness of breath, cough, hemoptysis, wheezing, nausea, vomiting, diarrhea, back or neck pain, rash, and any pruritus. (*See* R. at ML_0387-88.) In addition, Huynh documented the absence of any reactions by Karul to four chemical allergens. (R. at ML_0388.) Huynh prescribed a number of medications, including acetaminophen-oxycodone and oxycodone. (*Id*.) He also set up an appointment for Karul with Dr. David Chow ("Chow"), a pain management/spine specialist.

In January 2013, Fink completed a Residual Functional Capacity Questionnaire, reporting that Karul's "allergic and chemical induced asthma" condition was "static," and "good with medication and avoidance." (R. at ML_0594.)

*Karul's Claims Related To Back Pain*

In June 2010, Karul was seen by Dr. Thomas Stauss ("Stauss"), M.D., of Advance Pain Management in Racine, Wisconsin, for complaints of lower back pain and bilateral sciatica. A computed tomography ("CT") was performed which disclosed disc disease, including loss of disc height, shallow disc protrusions, mild central stenosis, and lower lumber arthopathy. (*Id*. at ML_1449.)

In August 2010, Stauss proceeded with a repeat epidural steroid injection for low back pain, lumbar radiculopathy, lumbar/lumbosacral disc degeneration, and lumbosacral facet joint pain. Stauss noted as follows:

> Virginia Karul is a 55-year-old white female with a history of lumbar diskopathy and spondylopathy with chronic low back and left greater than right lower extremity pain. She has had 75-80% residual benefit from the second lumbar epidural steroid injection at the L5-S1 level performed on 07/23/2010. The patient is planning on a long trip to California and wishes to proceed with a third injection. There are no complications from the

> previous injection. There is no change in her pain location. A recently performed EMG reveals evidence of a bilateral L5 radiculopathy, likely chronic.

(R. at ML_1455.) Stauss rated Karul as 38 out of 60 on the oswestry scale,[3] indicating "severe functional impairment." He also noted that Karul had benefitted from using a fentanyl patch for headaches and he found it reasonable to continue with the fentanyl patch with oxycodone for breakthrough pain. (*Id.*)

In April 2011, Karul saw Sabahat Ali ("Ali"), PA-C, under the supervision of/or collaboration with Stauss, regarding low back pain, lumbar radiculopathy, lumbar/lumbosacral disc degeneration, and lumbosacral facet joint pain. Ali's report indicates,

> Patient describes her low back pain as burning, tingling, numbness, pressure, aching. Patient reports that the pain score at best is 6/10, at worst is 10/10 and currently is 8/10. Pain is aggravated by walking, sitting. Pain gets better by lying down, ice. She has numbness in her bilateral feet and RLE. . . . The pain interferes with sleep, daily activities. The pain makes the patient feel frustrated, angry.

> Since the last visit, the initial pain has not changed. Patient denies any new type of pain

---

[3] The Oswestry Disability Index (also known as the Oswestry Low Back Pain Disability Questionnaire) is a tool that researchers and disability evaluators use to measure a patient's permanent functional disability.

See https://www.workcover.com/ (last visited Dec. 29, 2014.)

> since the last visit. . . . With current medication,
> she denies any improvement in activities of daily
> living.

(R. at ML_0178.) Ali rated Karul as 48 out of 60 on the oswestry scale,

indicating "severe functional impairment." (R. at ML_0180.)

Upon a physical examination of the lumbar spine Ali noted,

"Tenderness in bilateral sacroiliac joint. Range of motion is moderately

reduced. Pain with extension." (R. at ML_0179.) Ali's "Assessment," was

as follows:

> Patient w/chronic cervicalgia and associated
> [headaches] as well as intermittent, debilitating
> [lower back] and [lower extremity] pain. . . . The
> patient presents today after a 6 month absence.
> She reports that she has moved back from
> California due to issues surrounding her social
> security disability. She reports that she now has a
> lawyer and will be appealing the denial. . . . She
> reports that since her last LESI (lumbar epidural
> steroid injection) her radicular pain has been
> doing well, but she has increased low back pain
> that radiates to the hips. She will be scheduled for
> [bilateral] SI joint injections.

(R. at ML_0180.)

Later in 2011, Karul received treatment at the Racine pain

management clinic on April 25, May 6, May 24, June 9, June 28, July 26,

and August 9 (R. at ML_0170, 0174, 0182, 0184, 0186, 0188, 0190) and she

was seen by Stauss on five of those occasions. On August 9, Stauss

treated Karul for chronic neck pain by administering radiofrequency neurolysis. (R. at ML_0182, 0192.) Between August and December 2011, Karul also received consistent treatment for chronic back pain with prescription medications. (R. at ML_0400-03, 0414-16, 1291.)

About once a month from January through July 2012, Karul saw Chow for complaints relating to back pain and for refills of pain medications, including Percocet and Valium. (R. at ML_0262-80.) As of March 2012, Karul was 5'7" and weighed 225 pounds. (R. at ML_0273.) By July 2012, she weighed 217 pounds. (R. at ML_0273.)

### Karul's Claims Related To Headaches

As of October 2008, Karul began receiving treatment for headaches (R. at ML_1300.) At an office visit with Dr. Lawrence Tolson, M.D., in April 2009, Karul reported a 30-year history of headaches, including occasional migraines. (R. at ML_1894.) She stated that she had daily headaches of varying intensity for several years which had become "more difficult to control" following her occupational chemical exposures. (R. at ML_1894-95.)

In November 2009, Karul was treated in urgent care for a migraine headache, localized behind both eyes with nausea, photophobia, and blurry vision, that had lasted over five days. (R. at ML_0709-10.) Dr. Theresa

Mantolo, M.D,. diagnosed a classic migraine and provided her with pain medication. (R. at ML_0711.)

In January 2010, Phamle saw Karul regarding her chronic migraine condition, and noted: "The course is worsening and poor response to treatment. The effect on daily activities is change in activity level and change in in sleeping patterns. Migraines treated with oxycodone for last 7-8 years . . . [t]he patient presents with photophobia, nausea and dizziness." (R. at ML_0703.) Phamle recommended that Karul continue treating her migraines with oxycodone and referred her to her primary care provider for ongoing migraine management. (R at ML_0704.) In April 2010, Phamle saw Karul for her chronic migraine condition and "chemical induced respiratory distress" and refilled her oxycodone prescription. (R. at ML_0688-90.) In January 2011, Karul had another office visit with Phamle for complaints of nasal congestion, hoarseness and wheezing. Phamle also noted "Chronic Migraine without Aura" as a diagnosis and refilled her oxycodone prescription. (R. at ML_0428-31.)

Dr. Tal Moskowitz ("Moskowitz"), a neurologist, saw Karul in July and August 2011 for complaints of headaches and blurred vision. (R. at ML_1291-93.) In July, Moskowitz's impression included "[m]igraines and sinusitis history" and "[v]isual disturbance." (R. at ML_1295.) His

treatment plan included various laboratory tests. (*Id.*) At Karul's August office visit, Moskowitz reviewed Karul's lab results. Moskowtiz's clinical impression included "[d]aily classic migraines ongoing." (R. at ML_1291-92.) Moskowitz noted low B12 levels and recommended the following as part of Karul's treatment plan:

> Continue receiving monthly B12 injections
>
> Gastrointestinal testing to rule out certain causes of low B12
>
> Magnesium supplement tablets (slow-mag 65 mg)
>
> Keep a headache diary "to monitor any response to this gentle combination of migraine prophylaxis agent."
>
> Recommended a follow-up appointment in December 2011.

(R. at ML_1292.)

Karul received radiofrequency ablation ("RFA") treatment for her migraine headaches in early 2011, and as of July was being scheduled for a repeat procedure. (R. at ML_0172.) Karul began to treat her migraines with oxycodone in approximately 2002, and continued treatment with this medication as of July 2011. (R. at ML_0703, 0173.)

Karul was referred to Dr. Timothy Wei ("Wei") in December 2011 for her migraine headaches. (R. at ML_0833-35.) Wei saw Karul in March

2012 and again in May 2012, after Karul had received notice that her claim for continuing LTD benefits was being reviewed. (R. at ML_0160-64.)

### *Karul's Claims Related To Knee Pain*

Orthopedic surgeon Dr. Anath Shenoy's ("Shenoy") December 2011 medical records indicate that Karul reported left knee pain symptoms as of August 2011. (R. at ML_1176-79.) An x-ray of Karul's left knee revealed patellofemoral osteoarthritis and some irregularity of the posterior surface of the patella. (R. at ML_1178.) Shenoy opined that Karul's left knee pain was due to inflammation of the left knee joint "secondary to osteoarthritis and trauma." (R. at ML_1179.) As of December 2011, Karul weighed 225 pounds. (R. at ML_1177.)

## The Plan's Review of Karul's Claim for Benefits Under the Any Reasonable Occupation Standard

### *Initial Review*

Because Karul's initial 24 months of LTD benefits were due to expire, MetLife informed her that her eligibility for benefits would be reviewed as of November 25, 2011, under the any reasonable occupation standard as required by the Plan. (R. at ML_1249.) Her LTD benefits continued while her eligibility was under review.

As a part of the review, Swartz conducted an "independent" medical evaluation of Karul in February 2012. (R. at ML_1151-60.) Swartz performed an in-person physical examination of Karul, reviewed her medical records, and concluded that she was capable of performing sedentary work. Swartz reported that Karul was 5'6¼" and weighed 227 pounds. (R. at ML_1156.)

Swartz's report includes the following grounds for his conclusion:

> With respect to diagnoses by her treating physician, I find no evidence of lumbar radiculopathy and no evidence of cervical radiculopathy or brachial radiculitis.
>
> There is no evidence of any nerve root or spinal cord compression, either in the cervical or lumbar spines.
>
> With respect to the recommendations by Dr. Stauss, who stated she could not perform sedentary work, I would disagree.
>
> With respect to Dr. Stauss' recommendations that there would be no bending, twisting or squatting, I do not agree with that. With respect to reaching for only 15 minutes over two hours, I do not agree with those recommendations.
>
> With respect to her restrictions I would note that I found a normal range of motion of the cervical and lumbar spines. I did not find any objective neurologic findings, I found no tenderness or spasm in the cervical spine and there was only mild tenderness in most of the cervical spine and

without any spasm.

I found she squatted well with both knees and she walked well without a limp and could stand well on her toes and heels. Basically her exam was unremarkable.

(R. at ML_1159.)

Swartz's report further states:

With respect to her current restrictions, and her physical capacity, I would find that Ms. Karul during an eight hour work day, and [sic] is able to sit up to two hours at a time and up to eight hours during the course of a day. I find she is capable of standing up to one and [a] half hours at a time, for a total of up to five and a half hours during the course of a day. I find she is capable of walking up to 20 minutes at a time and up to four hours during the course of a day.

I find she is capable of lifting and carrying continuously up to five pounds; she can frequently lift and carry up to 10 pounds and occasionally can lift and carry up to 25 pounds.

. . . .

I find she can occasionally bend/squat/kneel/climb/ and frequently reach above shoulder level. She should avoid crawling.

She should avoid unprotected heights or being around moving machinery. She should avoid marked exposure to marked changes of temperature and humidity. With respect to exposure to dust, fumes and gases, this appears to be her major complaints; however, I will defer this

issue to the appropriate specialist.

(R. at ML_1159-60.)

In late February 2012, a nurse consultant acting on behalf of MetLife forwarded Swartz's report to Chow for review and comment. (R. at ML_1126-27.) MetLife did not receive a response from Chow.

In March 2012, vocational rehabilitation consultant James Merline ("Merline") conducted an employability assessment and labor market analysis ("LMA)" relating to Karul's benefits eligibility. He found that based on her training, education, and experience, she had transferable skills for other occupations and the ability to work at the sedentary level of physical exertion with restrictions and limitations as stated in the medical history section of the assessment. He identified three reasonable occupations in Antioch, California, where Karul was residing at the time, for which she was qualified. (R. at ML_1113-15.) The pay for some positions Merline identified far exceeded 60% of Karul's pre-disability income.

In March 2012, MetLife notified Karul that it had determined she was no longer "totally disabled" under the terms of the Plan. (R. at ML_1097-1100.) MetLife's letter stated that the medical evidence did not support a finding that she was unable to perform any reasonable

occupation; and it discussed the medical documentation contained in her claim file, Swartz's report, and Merline's assessment — including the employment alternatives qualifying as "reasonable occupations" under the Plan. The letter noted "there [was] no current medical information explaining the severity of [Karul's] migraines" (R. at ML_1098) and indicated that it had considered Karul's eligibility for SSDI benefits, although MetLife "[did] not know what SSA based their determination on," and that the SSA's determination was not binding on it. (R. at ML_1099). The letter included information regarding the administrative appeals process.

### *Karul's Appeal*

In September 2012, Karul's attorney informed MetLife that Karul would appeal, requested information from MetLife's file, and sought a 90-day extension to file the appeal. (R. at ML_1084.)  In November, MetLife provided Karul with a complete copy of her claim file, including Swartz's report and curriculum vitae; informed Karul that she could obtain the Plan documents from SCJ; and extended the time to appeal as requested.  (R. at ML_1057-58.)

In February 2013, the Defendants received Karul's appeal, which included information relating to her education, training, and experience;

new medical records; and her SSA file. (R. at ML_0003, 0532-39.) The medical records and notes submitted by Karul related primarily to March through September 2012 and were from various providers, including Wei, Chow, Phamle, Stauss/Nancy Spangler ("Spangler") PA-C and Dr. Diana Marar ("Marar").

On appeal, Karul identified various conditions as grounds for her benefits eligibility, including back, knee and chest pain; sciatica; migraines; visual impairment; and nausea and wheezing. (R. at ML_0537.) She also relied upon her receipt of SSDI benefits.

Karul's claim file was referred to Rooke who reviewed and summarized Karul's medical records, including those submitted on appeal, contacted and attempted to obtain information from Karul's treatment providers, and prepared a report. (R. at ML_0042-51.)

Phamle told Rooke that she had not seen Karul for over a year and was not aware of Karul's current status. (R. at ML_0043.) Phamle related that when she saw Karul she had migraines; she also had chest pain and stents placed, so she would have had cardiac limitations at that time; and she was being treated for a knee injury. (*Id.*)

Marar related that Karul reported back and neck pain and had recently received a cervical spinal stimulator adjustment. (*Id.*) Rooke

asked whether Karul's main problem was back and neck pain; Marar said that she had only seen Karul three times and was trying to get a handle on Karul's problems and help her to cut down on her pain medications because she did not like to give too much pain medication. Marar also related that Karul had migraine headaches and wore sunglasses constantly, including in the exam room, and that Karul seemed willing to work with Marar to get better. Because she had only seen Karul three times, Marar declined to provide an opinion regarding Karul's ability to sit at a desk and work. However, Marar stated that Karul's pain seemed genuine because she moved slowly and complained of pain when moving from the chair to the exam table. According to Marar, Karul complied with treatment. (R. at ML_0043-44.)

Wei told Rooke that he did not have a clear diagnosis for Karul and had not seen her for almost a year. (R. at ML_0044.) Chow stated that he could not speak about Karul as he had not seen her since July 2012. (*Id.*)

Stauss told Rooke that a recent CT scan of Karul's cervical and lumbar spine showed that Karul had very severe multi-level facet joint arthropathy and severe multi-level neuroforaminal stenosis, thus providing objective findings to support her complaints of pain. (*Id.*) Stauss stated that Karul could not lift or carry more than required by a

sedentary job, could not lift more than about 10 pounds on a consistent basis, and could not sit for very long without changing positions. Stauss indicated that Karul might be able to work four hours a day, but not eight-hour days. Rooke asked if the only source of Karul's pain was facet arthropathy because there was no documentation of nerve compression. Stauss said a CT scan is the best way to determine foraminal stenosis, and the scan showed bony encroachment on the nerves, so Karul did have nerve compression and some radiculopathy. He also said that ablation therapy was not a cure and should be repeated once a year. He was considering an intrathecal pump to manage her pain. Rooke asked if Karul was compliant with treatment, and Stauss said that she was a good patient. (R. at ML_0044-45.)

In their conversations with Rooke, none of Karul's treating physicians identified any side effects or limitations as a result of her medications. (*Id.*)

Based on her review of the records and the information she obtained from Karul's treating physicians, Rooke found that the medical information supported some physical functional limitations beyond March 31, 2012. (R. at ML_0046.) Rooke's report states:

> [Karul] has documented facet arthropathy and

should not lift more than 25 pounds occasionally and 10 pounds frequently. She can sit for an 8 hour day with breaks to change positions or stand and stretch at will. She was diagnosed with chemical induced occupational asthma but there was no documentation of respiratory impairment or decreased pulmonary function or reaction to any specific chemicals. She complained of headaches triggered by multiple chemical sensitivities which she continued to have almost 4 years after she stopped working. There is no justification for limitations or restrictions related to chemical exposures at work because [Karul] continued to have the same symptoms outside the workplace.

(*Id.*)

Rooke's report and opinion also contained the following information regarding Karul's conditions and treatment:

On 4/18/12 [Karul] had a follow-up visit with Pain Management/Spine Specialist . . . Chow at the California Spine Center for evaluation of bilateral neck pain, low back pain, and thoracic back pain. . . . The impression/differential diagnosis was: cervical disc protrusion, grade 1 spondylolisthesis at C2 on C3, C3 on C4 and C4 on C5, cervical degenerative radiculopathy, cervical degenerative disc disease at C2 to C6, cervical stenosis, cervical facet joint arthropathy, cervical radiculopathy, metallic artifact from implanted spinal cord stimulator at C2-C3 and C3-C4 levels, lumbar disc protrusion, lumbar stenosis, disc protrusion, lumbar stenosis, lumbar facet joint arthropathy, bilateral upper extremity and lower extremity peripheral neuropathy, hypertension, Barrett's esophagus, chronic headaches, migraine

headaches and bilateral TMS. . . . The only significant clinical difference in the visits was improved blood pressure control at the last 2 visits and prescription for a Flector patch. There was no medical documentation of an impairment that would prevent [Karul] from sitting for an 8 hour period with freedom to change her position as needed and take breaks to stand and stretch as needed, and a lifting limit of 25 pounds occasionally and 10 pounds frequently.

(R. at ML_0047.)

On 5/18/12 [Karul] had cardiac catheterization which found severe but focal 3-vessel disease involving the left anterior descending artery, mid right coronary artery and proximal obtuse marginal branch. She had percutaneous balloon angioplasty and stenting with 2 stents placed in the mid left anterior descending artery with decreased blockage from 80% to 0%. On 5/21/12 catheterization was repeated and a single stent was place [sic] in the [] right coronary artery that resolved blockage from 80% to 0%. She was discharged in stable condition. . . . There was actually no documentation of physical functional limitations during this hospital stay. The only rash noted was a small lesion on her arm. There was no documentation of breathing difficulty or any toxic reactions in a hospital setting where multiple chemicals are used. She was able to exercise for 6 minutes and 15 seconds and achieve 7 METS of exercise before the test was stopped for chest and left arm pain as well as fatigue. Post-catheterization and stenting with increased blood flow to her heart, exercise tolerance without chest pain would be expected to improve.

(R. at ML_0048.)

> On 5/29/12 [Karul] saw . . . Phamle for hospital visit follow-up. . . . On physical examination no height or weight was documented and no abnormalities were noted. The diagnoses were atherosclerotic heart disease with angina pectoris, essential hypertension, chronic migraines without aura, essential hyperglyceridemia and subjective visual disturbance. Labs were ordered and mediations adjusted. There was no documentation of impairment or physical functional limitations.

(*Id.*)

> On 9/27/12 [Karul] had a follow-up visit with. . . Stauss/ . . . Spangler for evaluation of low back pain. . . . On physical exam it was noted that [Karul] "sits comfortably in chair," rises slowly to stand, and walks with an antalgic gait. . . . It was noted that [Karul] sat comfortably; there was no documentation of an impairment that would prevent her from sitting at a desk with freedom to change positions and move about at will as needed to reli[e]ve discomfort.

(R. at ML_0048-49.)

> On 1/22/13 . . . Fink completed a Residual Functional Capacity Questionnaire. . . . He stated that there was no pain and the only objective finding noted was discomfort when sitting. Review of his notes indicated that the discomfort was due to sciatic pain not respiratory distress or wheezing. He stated that [Karul's] ability to work depended on her environment and respiratory status. There was no documentation of observed respiratory distress or decreased pulmonary function in any of her medical records.

(R. at ML_0049.)

Rooke noted that although many of Karul's complaints were obesity related, there was no mention of obesity in the records nor any medical advice related to obesity. (R. at ML_0050.)

MetLife provided copies of Rooke's report to Karul and her treating physicians. (R. at ML_0082-137.) MetLife informed the physicians that if they did not agree with the information contained in the report they should submit clinical evidence to support their own conclusions. Marar indicated that she would be sending Karul to a specialist before submitting any response, but MetLife never received any additional information from Marar or any of Karul's other treating physicians. (R. at ML_0007.)

At MetLife's request, Rooke provided an addendum to her report in which she opined:

> Permanent removal from a workplace is only justified if there is a specific documented exposure in the workplace and the worker's condition significantly improves after removal. This is not the case with [Karul]; she continues to report environmental chemical sensitivity that is unrelated to the workplace. There is no justification for permanent removal from any workplace on the basis of possible exposure to non-specific irritant chemicals.

(ML_0038.)

The addendum also responded to a number of explicit follow-up inquiries from MetLife regarding Karul's chemical sensitivity complaints:

> .2. Regardless of whether any exposure to irritant chemicals would occur at work, at home or otherwise, please opine as to whether the information supports any functional restrictions or limitations (and the extent of those restrictions and limitations) for the period from on or around 3/31/2012 forward. Functional limitations include any reduction in ability to work full time.
>
> "No, the medical documentation reviewed does not support functional limitations or work restrictions due to [Karul's] symptoms and complaints of chemical sensitivity."

(*Id*.)

> 3. If the information supports functional limitations, please specify the types and scope of the limitations [Karul] would have. Describe the specific, clinical finding/data or other medical information noted in the records in support of functional limitations. Please list each document referred to above including provider's name, specialty, date of visit, clinical finding.
>
> "The medical documentation does not support functional limitations due to chemical sensitivity."

(R. at ML_0038-0039.)

> 4. If the information does not support functional limitations, please describe using the format set forth in #3 above.

In answer to question 4, Rooke summarized the medical records from May 11, April 18, May 16, May 29 and September 27, 2012, and January 22,

2013. Each summary notes no clinical evidence or medical documentation of impairment from chemical sensitivity. (R. at ML_0039-40.)

> 5. With respect to [Karul's] chemical sensitivity-related conditions, was [Karul] receiving appropriate care and treatment for such conditions for the time period specified?
>
> "Yes, there were no chemical sensitivity-related conditions documented in the medical records reviewed. There were no signs of respiratory distress due to chemical exposure such as dyspnea, coryza or wheezing. [Karul] reported a rash but there [was] no documented [] dermatitis or any skin lesions that would cause impairment. [Karul's] headaches were documented as migraine headaches and photophobia was attributed to migraines not chemical sensitivity."

(R. at ML_0040.) Rooke's addendum contains her summary of Karul's medical records and states that she reviewed Karul's medical records and her SSA file. (R. at ML_0039; 0042.)

MetLife noted that the SSA file included medical records, and it asked Rooke to confirm whether, as part of her review of the records, she reviewed the SSA file. Rooke responded:

> [A]ll of the medical records provided were reviewed several times and repeat review does not change my prior opinion. In her application for SSDI benefits [Karul] stated that the condition that limited her ability to work was chemical-induced respiratory illness, sciatica, migraines and blurry vision. On 3/12/10 [Karul] had a CT scan of the maxillofacial bones and mandible with

contrast which showed previous sinus surgery, mild paranasal sinus mucosal disease and a possible nasal polyp. On 8/12/10 Medical Consultant, E. Christian M.D. completed a Physical Residual Functional Capacity Assessment for SSA in which the primary diagnosis was "other diseases of the respiratory system", migraine and "HNP." There were no external limitations, Dr. Christian stated that [Karul] could frequently climb ramps/stairs but never ladder/rope or scaffolds. She could balance, stoop, kneel, and crouch but never crawl. There were no manipulative, visual or communicative limitations but there were restrictions on even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. [Karul] was advised to avoid concentrated exposure to hazards such as machinery or heights. Regarding the symptoms alleged by [Karul], Dr. Christian stated that: Essentially all physical exams were normal and the category he chose was: The severity and duration of the symptoms, in his judgment, was disproportionate to the expected severity or expected duration on the basis of the [Karul's] medically determinable impairment. On 8/13/10 the SSDI claim was denied based on medical records that included notes from Allergist .Dr. Jordan Fink. This decision was appealed, and on 10/29/11 SSDI benefits were awarded effective from 11/2010. This was prior to the current review period after 3/31/12. There was no medical documentation of respiratory disease or impairment from a chemical-induced "disorder of the respiratory system" or other chemical sensitivity in the medical records available from review from 3/31/2012 to the present.

(R. at ML_0042.) The addendum confirmed Rooke's original report finding that Karul did not have functional limitations preventing her from working in any occupation. (*Id.*)

At MetLife's request, a second labor market survey was completed by Rehabilitation Consultant Renee Lange, MS, CRC. This survey described and evaluated multiple potential employment opportunities for Karul and stated, "[v]arious employers were identified in the Antioch, CA area for research associate, research assistant, research and development director, consultant and related positions. It would appear that the research associate positions would meet with . . . Karul's restrictions and wage level." (R. at ML_0058.)

After Karul moved to Council Bluffs, Iowa, a separate employability assessment was conducted by Vocational Rehabilitation Consultant Faith Rossworn ("Rossworn"), MS, CRC. (R. at ML_0031-32.) As part of this assessment, Rossworn identified the position of Research Assistant II, with a median annual wage position of $106,360, as one for which Karul was qualified and which could be performed within her restrictions and limitations. Rossworn's assessment states:

> Karul has the ability to work within the restrictions and limitations as stated above in the Medical History section. An EA and Labor Market

> Analysis (LMA) were performed which identified
> alternate occupations for which she is qualified
> and are found to exist in her local economy at
> commensurate wage of $55,556.80 per year.

(R. at ML_0032.)

The Committee conducted an independent review of Karul's claim for LTD benefits under the any reasonable occupation standard. In conducting its review, Karul's entire claim file, including her medical records, SSA file, and the submissions of her attorney, was available to the Committee. (R. at ML_2611, 2616.)

The Committee's condensed summary of the record materials contains notes throughout the margins. (R. at ML_2613-17, ML_2637, ML_2641-42, ML_266, ML_2729-31.) The minutes from the Committee's review meeting note that it "reviewed and discussed the documentation supplied for this case and agree[d] that medical findings [were] not sufficient to indicate [Karul] could not perform a sedentary position with restrictions." (R. at ML_2762.)

On July 23, 2013, the Committee unanimously determined that Karul was not disabled as defined by the Plan after March 31, 2012 (R. at ML_0002) and sent a letter to Karul which stated, in part:

> We acknowledge and considered Ms. Karul's
> continued symptoms and complaints. While we do

not discount that she may continue to experience symptoms, complaints and some restrictions and limitations, we are without sufficient clinical evidence supporting that her symptoms prevented Ms. Karul from performing work at any reasonable occupation for which she was reasonably qualified taking into account her training, education and experience from April 1, 2012 forward. While some restrictions and limitations were supported, alternate gainful occupations were identified that she could perform.

Although there may have been a limited period of time during which additional restrictions and limitations were supported based on Ms. Karul's cardiac condition, resulting in her May 2012 hospitalization, she was discharged in stable condition and it was noted that the blockage at issue improved from 80% to 0% with the placement of the stent on May 18, 2012, with the same outcome from the additional stent that was placed on May 21, 2012. Ms. Karul was hemodynamically stable after the second procedure and was discharged the next day in stable condition. While we acknowledge that Ms. Karul would not have been able to work during her May 2012 hospitalization, we are without sufficient clinical evidence  supporting that she remained impaired after her discharge. Additionally, there was insufficient medical evidence to support that she required restrictions and limitations in regards to her cardiac condition prior to her May 2012 hospitalization.

(R. at ML_0007.)

The letter addressed the SSA's grant of SSDI benefits, which Karul

raised in her appeal, noting that the SSA had initially denied Karul's

request on the grounds that her "condition [was] not severe enough to keep [her] from working." (R. at ML_0008.) The Committee further explained that Rooke was unable to locate any information to provide a medical basis for the SSA's decision to reverse itself on appeal, that the standard applicable to the SSA's determination regarding benefits is based upon the evaluation of different factors than the analysis required under the Plan, and that the SSA's determination is not binding on the Plan.

The Committee concluded that the available medical information failed to support a finding of disability so as to preclude Karul from performing any reasonable occupation from April 1, 2012 forward. (R. at ML_0008-9.) The Committee stated that Karul "did not meet the Plan's definition of disability after March 31, 2012, and that the decision to terminate her Plan benefits as of April 1, 2012 was appropriate." (R. at ML_0009.)

**Analysis**

The Defendants contend that substantial evidence in the administrative record supports the determination that Karul is not "totally disabled" as defined by the Plan, is able to perform the duties of "any reasonable occupation," and that conclusion was not arbitrary and

capricious and should be upheld by this Court. (Defs. Jt. Br. Mot. Rule 52 or, alternatively, Rule 56, 2.) (ECF No. 30.)

Karul contends that the Defendants' decision to terminate disability benefits was arbitrary and capricious because they failed to understand the basic facts underlying her appeal, procured opinions from biased medical consultants, and ignored crucial evidence that she provided. She also maintains that the Defendants failed to adequately consider the favorable disability determination from the SSA. (Pl. Opp'n Mem. 25-26.) (ECF No. 32.)

Where, as here, the plan grants the administrator the discretion to determine eligibility and construe the plan terms, the Court reviews the administrator's decision under an arbitrary and capricious standard. *Wetzler v. Ill. CPA Soc'y & Found. Ret. Income Plan,* 586 F.3d 1053, 1057 (7th Cir. 2009). Under this standard "an administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable interpretation of the plan's language." *Id.* In evaluating whether the administrator's decision was arbitrary and capricious the Court may consider, among other factors, the administrator's structural conflict of interest and the process afforded the parties. *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1344 (7th Cir. 1995); *see also Majeski v.*

*Metro. Life Ins. Co.,* 590 F.3d 478, 482 (7th Cir. 2009) (the gravity of the administrator's conflict of interest may be "inferred from the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim").

Review under this deferential standard is not "a rubber stamp," however, and upon review a termination will not be upheld if "there is an absence of reasoning in the record to support it," *Hackett v. Xerox Corp. Long–Term Disability Income Plan,* 315 F.3d 771, 774-75 (7th Cir. 2003). ERISA also requires that "specific reasons for denial be communicated to [Karul] and that [Karul] be afforded an opportunity for full and fair review by the administrator." *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. No. 506*, 545 F.3d 555, 559 (7th Cir. 2008),(internal quotations omitted), abrogated on other grounds by *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 250 n.2 (2010).

An administrator's conflict of interest is a key consideration under this deferential standard. "In conducting this review, [the Court] remain[s] cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Holmstrom,* 615 F.3d at 766 (Citations omitted). In such cases the conflict of interest is "weighed as a

factor in determining whether there is an abuse of discretion." *Id.* at 767, (citing *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 116 (2008)).

In challenging the non-disability determination, Karul relies on *Hangarter v. Provident Life and Accident Ins. Co.,* 373 F.3d 998, 1011 (9th Cir. 2004), which identified Swartz as a biased Independent Medical Examiner ("IME"). In *Hangarter*, the plaintiff purchased an "own occupation" disability policy from Paul Revere Insurance Company ("Paul Revere"). Benefits were paid on the policy for 11 months and then terminated based on the determination that the plaintiff was not "totally disabled." *Id.* at 1003. After the jury found in favor of the plaintiff on her state law claim for breach of the implied covenant of good faith and fair dealing based on the long-term disability plan administrator's biased investigation into the claim, the district court judge denied a motion by the insurer for a judgment as a matter of law on that claim. The appeals court upheld the denial, in part based on evidence that the plan administrator had "exhibited bias in selecting and retaining Swartz as the IME." *Id.* at 1011. Paul Revere used Swartz as an IME 19 times from 1995 to 2000, and the evidence included expert testimony that when an insurer uses the same IME on a continual basis the examiner becomes biased due to a loss of independence. *Id.* The appeals court also cited evidence that "in

thirteen out of thirteen cases involving claims for total disability Dr. Swartz rejected the insured's claim that he or she was totally disabled." *Id.*

Although Swartz was involved in this case, Paul Revere is not. The record does not include any evidence regarding the number of times MetLife retained Swartz, or the outcome of any total disability claims he reviewed for them. Thus, this case does not include evidence that the choice of Swartz was improper or that Swartz was biased in his review of Karul's claim. In addition, Karul's claim was assessed by Rooke on the administrative appeal. Thus, *Hangarter* findings with respect to Swartz are of minimal significance.

However, having reviewed the entire record, the Court concludes that the Defendants' non-disability determination was arbitrary and capricious. A key issue is Karul's pain and its impact on her ability to lift or carry, and sit, and to work on a sustained basis. When reviewing a claim for disability benefits, a plan administrator is required to weigh the evidence for and against the insured's eligibility for benefits and, within reasonable limits, the reasons for rejecting evidence must be articulated. *Hackett,* 315 F.3d at 775.

A plan administrator is entitled to disagree with a treating physician, or to discount some reports in favor of other evidence it finds

more credible — so long as it explains and supports its decision to do so. *Speciale v. Blue Cross & Blue Shield Ass'n,* 538 F.3d 615, 623-24 (7th Cir. 2008). A plan administrator may also rely on the opinions of record reviewing physicians in assessing disability. *See Black v. Long Term Disability Ins.,* 582 F.3d 738, 745 (7th Cir. 2009). While it may be natural to suspect that a doctor hired by an administrator to render an expert opinion might be biased toward the source of his or her pay, any such tilt is likely to be offset by the tendency of treating physicians to "advocate" on behalf of their patients. *See Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 917 (7th Cir. 2003).

Stauss, Karul's treating physician, stated that Karul could not lift or carry more than required by a sedentary job, could not lift more than about ten pounds on a consistent basis, and could not sit for very long without changing positions. Stauss indicated Karul might be able to work four hours a day, but not eight-hour days. Swartz's statement that he disagrees with Stauss does not articulate a reasoned basis for that position. Swartz has not explained why he disagrees with Stauss.

Reviewing physician Rooke opined that Karul had no restrictions with respect to standing and walking, and that Karul was capable of sitting for an eight-hour day provided that she take breaks to stand and

stretch. However, Rooke's summary of the information provided by Stauss is a version stripped of the relevant adjectives used by the treating physician. For example, Stauss told Rooke that a recent CT scan of Karul's cervical and lumbar spine showed Karul had "**very severe multi-level facet joint arthropathy and severe multi-level neuroforaminal stenosis**" thus providing objective findings to support her complaints of pain. (R. at ML_0044.) (Emphasis added.) Rooke reported that Karul has **documented facet arthropathy**. (R. at ML_0046.) (Emphasis added.) Rooke did not indicate that Stauss' interpretation of the CT scan was incorrect or whether she disagreed. While the arbitrary and capricious standard is deferential, there is an absence of reasoning in the record and therefore the non-disability determination cannot be sustained. *See Leger v. Tribune Co. Long Term Disability Ben. Plan,* 557 F.3d 823, 832 (7th Cir. 2009).

Rooke noted that although many of Karul's complaints were obesity related, there was no mention of obesity in the records nor any medical advice related to obesity. To the contrary, after Karul began seeking treatment for severe knee pain at the end of 2011, treating physician Shenoy recommended "[c]onservative treatment with strong urgency of losing weight, with Weight Watcher's advised." (R. at ML_1179.) In

February 2013, Marar also identified obesity as a problem, recording Karul's weight as 213.4 pounds and a body mass index ("BMI")[4] of 33.42. (R. at ML_00152-53.)

Karul's weight was 222.67 pounds in October 2009 with a BMI of 34.8, 225 pounds in December 2009, 227 pounds in February 2011 with a BMI of 36.6, 217 pounds in July 2011, and 213.4 pounds in February 2012, with a BMI of 33.42. In other words, Karul was obese when her 24 months of LTD benefits began, and remained obese during the time the Defendants were reevaluating her disability under the any occupation standard. The reliance on obesity -- a condition that was relatively constant during the entire time of Karul's claimed disability -- as a basis for subsequently finding her not disabled also calls into question the purported reasonableness of the Defendants' determination. The Court concludes that the Defendants' determination that Karul was not disabled for all reasonable occupations was arbitrary and capricious.

The fact that the SSA determined Karul was disabled is additional reinforcement for the conclusion that Karul submitted proof of a continuing disability to the Defendants. Although determinations and

---

[4] *See* http://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited March 3, 2015). A BMI of 30 or greater is classified as obese.

decisions made by the SSA are not binding in ERISA actions, *see,* e.*g.,* *Anderson v. Operative Plasterers' & Cement Masons' Int'l. Assoc.,* 991 F.2d 356, 358 (7th Cir. 1993) (Social Security determination of disability not dispositive of disability under pension plan), a determination of disability under the Social Security Act can be considered when applicable, *see Ladd v. ITT Corp.,* 148 F.3d 753, 755-56 (7th Cir. 1998) (considering grant of social security benefits when determining whether insured's denial was arbitrary and capricious under ERISA). The social security determination of disability is made under a different standard: to receive benefits under social security regulations, the claimant must have a "general" disability. However, this difference does not mean that the social security determination should be afforded no weight. Although the social security determination of disability is not binding on this Court, it corroborates the conclusion that Karul is disabled from any reasonable occupation.

Having found a violation of ERISA, the Court must determine the appropriate remedy by focusing on the "claimant's benefit status" before the wrongful denial. *Holmstrom,* 615 F.3d at 778 (citation omitted). The goal is to restore the status quo prior to the defective proceedings." *See Hackett,* 315 F.3d at 776. In cases involving wrongfully terminated

benefits, the status quo prior to the defective procedure is the continuation of benefits," making "a reinstatement of benefits" the proper remedy. *Id.*

The Defendants terminated Karul's benefits as April 1, 2012. In order to return Karul to the status quo existing prior to that termination, the Court will retroactively reinstate Karul's LTDI benefits as of April 1, 2012, and declares that she continues to be eligible for those benefits.

Karul also seeks prejudgment interest on her award of benefits and attorney's fees. Whether to award an ERISA plaintiff pre-judgment interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). There is a presumption in favor of prejudgment interest awards in ERISA cases. *Id.* Without such an award, compensation of the plaintiff is incomplete and the defendant has an incentive to delay. *Id.* Here, such an award is appropriate in order to make Karul whole. The appropriate rate for prejudgment interest in ERISA cases is the prime rate. *Id.* The Court further concludes that the prejudgment interest should be compounded annually.

Karul also requests an award of attorney fees. ERISA permits the Court to award a reasonable attorneys' fee to either party, *see* 29 U.S.C. § 1132(g)(1); *Bowerman v. Wal-Mart Stores, Inc.,* 226 F.3d 574, 592 (7th Cir.

2000).  A fees claimant must show "some degree of success on the merits" before a court may award attorney's fees under § 1132(g)(1).  *Hardt,* 560 U.S. at 255 (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)).  A claimant does not satisfy that requirement by achieving "trivial success on the merits" or a "purely procedural victor[y]," but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a "lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'"  *Id.* (citations omitted).

A party meeting this standard is "eligible for fees," and then the Court "must determine whether fees are appropriate."  *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis.,* 657 F.3d 496, 505 (7th Cir. 2011); *see Pakovich v. Verizon LTD Plan,* 653 F.3d 488, 494 (7th Cir. 2011).  There are "two tests for analyzing whether attorney fees should be awarded to a party in an ERISA case."  *Kolbe & Kolbe,* 657 F.3d at 505.  The Seventh Circuit summarized the two tests as follows:

> The first test looks at the following five factors: 1) the degree of the offending parties' culpability or bad faith; 2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; 3) whether or not an award of attorney's fees against the offending parties would deter other persons acting under similar

circumstances; 4) the amount of benefit conferred on members of the pension plan as a whole; and 5) the relative merits of the parties' positions. The second test looks to whether or not the losing party's position was substantially justified. In any event, both tests essentially ask the same question: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent? In determining whether the losing party's position was 'substantially justified,' the Supreme Court has stated that a party's position is justified to a degree that could satisfy a reasonable person.

*Id.* at 505-06 (citations and quotation marks omitted). The Seventh Circuit has "affirmed the use of both tests post-*Hardt*." *Temme v. Bemis Co., Inc.,* 762 F.3d 544, 550 (7th Cir. 2014) (citing *Leimkuehler v. Am. United Life Ins. Co.,* 713 F.3d 905, 915 (7th Cir. 2013); *Raybourne v. Cigna Life Ins. Co. of New York,* 700 F.3d 1076, 1090-91 (7th Cir. 2012)).

Karul has achieved "some success on the merits." *Hardt,* 560 U.S. at 255. Therefore, Karul is "eligible for fees" under § 1132(a). *Kolbe & Kolbe,* 657 F.3d at 505, and the Court must address next whether an award of attorneys' fees is appropriate. The Court finds that, as shown above, the Defendants' position was not substantially justified and was not taken in good faith. Therefore, Karul is entitled to reasonable attorney's fees and costs.

The parties are directed to engage in a good faith effort to agree to the amount of retroactive benefits, prejudgment interest compounded annually, and reasonable attorney fees and costs, and to file a stipulation and proposed order by March 27, 2015.

If the parties are unable to reach a stipulation, they are to file statements setting forth their respective positions, together with supporting documentation, on or before April 10, 2015. If the amount of attorney fees/costs are disputed, Karul's filing must include an itemized claim presented in a format that includes the hourly rates of the attorney(s) who worked on the case and provides a sufficient factual basis for the Court to determine the reasonableness of those rates and the time they devoted to the case. Any responses must be filed on or before April 16, 2015. Thereafter, the Court will resolve the issue(s) and direct the entry of final judgment in favor of Karul and against the Defendants.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Karul's motion for judgment in her favor (ECF No. 22) finding that the Defendants are liable for terminating her claim LTD benefits as of April 1, 2012, in violation of 29 U.S.C. § 1132(a)(1)(B) of ERISA is **GRANTED**; Karul's benefits are reinstated retroactively for the period

beginning April 1, 2012, with prejudgment interest at the prime rate compounded annually, and Karul is awarded costs and attorney fees pursuant to 29 U.S.C. § 1132(g);

The parties must engage in a good faith effort to agree to the amount of retroactive benefits, prejudgment interest at the prime rate compounded annually, attorney fees and costs consistent with this Decision and Order, and to file a stipulation and proposed order **by March 27, 2015**;

If the parties are unable to reach a stipulation, they must file statements setting forth their respective positions, together with supporting documentation, **on or before April 10, 2015**.  Any responses must be filed **on or before April 16, 2015**.

The Defendants' motions to strike (ECF Nos. 40, 42) are **DENIED**;

The Defendants' joint motion for relief under Rule 52(a) or in the alternative for summary judgment pursuant to Rule 56 (ECF No. 27) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 10th day of March, 2015.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**